**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **GILLIAN K. SUESS,** | |
| **Plaintiff,** | |
| **v.** | **No. 11 C 4090** |
| | **Magistrate Judge Mary M. Rowland** |
| **CAROLYN W. COLVIN, Acting Commissioner of Social Security,**[1] | |
| **Defendant.** | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Gillian K. Suess filed this action seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits under the Social Security Act ("SSA"). 42 U.S.C. §§ 416, 423(d), 1381a. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and have filed cross-motions for summary judgment. For the reasons stated below, this case is remanded for proceedings consistent with this opinion.

## I. THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits ("DIB"), a claimant must establish that he or she is disabled within the meaning of the SSA.[2] *York v. Massanari*, 155 F.

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and is substituted for her predecessor, Michael J. Astrue, as the proper defendant in this action. Fed. R. Civ. P. 26(d)(1).

[2] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq.*

Supp. 2d 973, 977 (N.D. Ill. 2001. A person is disabled if he or she is unable to per-form "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physi-cal or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific im-pairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520, 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on July 26, 2005,[3] alleging she became disabled on April 30, 2002, due to panic and anxiety attacks. (R. at 220). The application was denied, after which Plaintiff filed a timely request for a hearing. (*Id.* at 127–32). The Administrative Law Judge ("ALJ") conducted a hearing on July 10, 2007 (*id.* at 29–54), and denied benefits 17 days later, on July 27, 2007 (*id.* at 102–13, 132). The Appeals Counsel accepted the request for review and remanded the case, directing the ALJ to further consider Plaintiff's work history, her mental impairments, and the ALJ's RFC finding, including taking evidence from a vocational expert, if warranted. (*Id.* at 114–17).

On March 30, 2009, Plaintiff, represented by counsel, testified at a hearing conducted by video teleconferencing before an ALJ. The ALJ also heard testimony from Ellen Rozenfeld, Psy.D., a medical expert ("ME"), and William Newman, a vocational expert ("VE"). (R. at 77, 91, 162). Following this hearing, the ALJ again denied benefits. (*Id.* at 11–26). The Appeals Council denied review. (*Id.* at 1–3). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity from her alleged onset

---

[3] Plaintiff's motion indicates she applied sometime in June 2005. (P's Mot. 2).

date of April 30, 2002, through her date last insured of March 31, 2009.[4] (R. at 13.)

At step two, the ALJ found that Plaintiff's severe impairments consist of "question-

able" fibromyalgia; "possible" carpal tunnel syndrome; headaches; history of dizzi-

ness; major depressive disorder; generalized anxiety disorder and panic disorder;

and somatoform disorder. (*Id.* at 14). At step three, the ALJ determined that Plain-

tiff's impairments do not meet or medically equal the severity of any of the listings

enumerated in the regulations. (*Id.* at 14–16). The ALJ then assessed Plaintiff's re-

sidual functional capacity ("RFC")[5] and determined that Plaintiff has the RFC to

perform "light work as defined in 20 CFR 404.1567(b)" with the following additional

limitations:

> lifting 20 pounds occasionally and ten pounds frequently; standing
> and/or walking for at least six hours each in an eight hour workday;
> sitting for six to eight hours in an eight hour workday; using upper ex-
> tremity for activities that do not require repetitive/constant simple
> grasping; and simple, routine, low stress job tasks that involve only
> routine changes (no multiple changes) and require working primarily
> alone, with no regular general public contact.

(*Id.* at 16, 92–93). Based on Plaintiff's RFC and the VE's testimony, the ALJ deter-

mined at step four that Plaintiff could not perform any past relevant work through

the date she was last insured. (*Id.* at 24, 93). At step five, based on Plaintiff's RFC,

her vocational factors, and the VE's testimony, the ALJ determined that there are

---

[4] The ALJ determined that the claimant last met the insured status requirements of the SSA on March 31, 2009. (R. at 13). Therefore, Plaintiff must establish that she was disabled prior to that date in order to qualify for benefits. *Bjornson v. Astrue,* 671 F.3d 640, 641 (7th Cir. 2012) ("only if [plaintiff] was disabled from full-time work by [her last insured] date is she eligible for benefits").

[5] "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008).

jobs that exist in significant numbers in the national economy that Plaintiff can perform, including work as a machine feeder, hand packer, and housekeeper/cleaner. (*Id.* at 25, 93). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability as defined by the SSA as of the date she was last insured. (*Id.* at 26).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d

589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. DISCUSSION

Plaintiff raises the following arguments in support of her request for a reversal or a remand: (1) the ALJ failed to support her finding that claimant could perform the physical requirements of light work; (2) the ALJ erred by questioning the diagnosis of the treating physician;[6] (3) the ALJ committed numerous factual and legal errors in assessing claimant's credibility; (4) the ALJ failed to consider claimant's headaches, need to lie down, panic attacks and somatization disorder; and (5) the ALJ failed to weigh the uncontradicted opinion of her treating physician, David Dansdill, M.D. in violation of the Agency's regulations and rulings. (P's Mot. 2).

## A.  Relevant Medical and Vocational Evidence in the Record

It is undisputed that Suess has an anxiety disorder that results in panic attacks. (R. at 14, 34, 61). She worked at Honeywell for 25 years, until she went on sick

---

[6] The ALJ's findings describe Plaintiff as having "questionable" fibromyalgia and "possible" carpel tunnel syndrome. (R. at 16). Plaintiff argues, in a single paragraph, that the ALJ's use of these adjectives means the ALJ "misse[d] important diagnoses" requiring remand. (P's Mot. 6). The Court disagrees. The use of pejorative adjectives by the ALJ is not helpful, but the ALJ considered these ailments to find Suess suffered severe impairments. Therefore, the Court rejects this argument as a basis to reverse or remand the ALJ's findings.

leave in April 2002 due to her worsening anxiety and panic attacks. (*Id.* at 37, 45). During her panic attacks, her symptoms include: shakiness, heart palpitations, shortness of breath, feeling faint almost to the point of passing out, and stomach and intestinal cramps. (*Id.* at 34, 39–40). She suffers dizziness,[7] her balance is affected, and she cannot concentrate to the point that she does not recall what is said to her. (*Id.* at 47, 75). Her anxiety disorder results in her suffering from "severe headaches due to stress" and extreme fatigue. (*Id.* at 47). It also makes it difficult for her to concentrate. (*Id.* at 77). In addition, Suess has been diagnosed with depression and somatoform disorder. (*Id.* at 78). Leaving home or facing a deadline brings on more panic attacks. (*Id.* at 69). At her 2007 hearing, she testified that she does not attend movies, attend church, go to restaurants, or travel out of town. (*Id.* at 43–44).

Plaintiff has taken numerous medications to treat her anxiety; some of which produced side-effects she was unable to tolerate. She also testified to financial hardship preventing her from seeking either medication or counseling. For instance, while she was still working at Honeywell, she was taking Xanax three times per day and Effexor; these medications left her very tired and did not control her panic attacks. (R. at 37–38, 42). According to the medical records, while being seen by Dr. Dansdill in early 2002, in addition to the Effexor, she was prescribed 10 mg daily of Paxil for anxiety, with the dosage increasing to 30 mg per day. (*Id.* at 320). Howev-

---

[7] Suess first saw an ear nose and throat specialist about her dizziness in January 2001. (R. at 283–91).

er, Dr. Dansdill's notes indicate that "she has increasing shakiness and anxiousness with each increase in the dose." (*Id.* at 320). On September 5, 2003, Plaintiff cancelled her appointment with Dansdill and requested a generic substitute for the Effexor due to a lack of insurance. (*Id.* at 308).

In March 2005, Jeffrey Schleich, M.D. prescribed her 20 mg of Paxil per day, apparently "due to expense." (R. at 325). Dr. Schleich also directed her to take Xanax, as needed. (*Id.*) In July of that year, despite the medication, she was still reporting "panic attacks really bad when out in public." (*Id.* at 324). It appears Dr. Schleich then switched her to Prozac. (*Id.* at 323). However, 40 mg of Prozac left her lightheaded (*id.* at 322), so her dose was reduced to 30 mg (*id.* at 321). Dr. Schleich notes that "If she is able to tolerate the 30 mg and still has not enough relief, we may be able to get her up to the 40 mg." (*Id.* at 321). The record further notes that she has "no insurance." (*Id.* at 324).

In June 2005, Dr. Dansdill, after treating Plaintiff for over two years, completed a Residual Functional Capacity Questionnaire. (R. at 332–36). In it, he indicates that she was "severely limited by panic attacks [and] agoraphobia." (*Id.* at 333). He opined that Plaintiff was incapable of "even 'low stress' jobs" and that her attention and concentration would be interrupted frequently to occasionally during a typical work day. (*Id.*). He notes that Prozac leaves Suess nauseous and Alprazolam leaves her drowsy. (*Id.*). Finally, given the likelihood of good days and bad days, Dr. Dansdill opined that Plaintiff would "likely be absent from work" more than four days per month. (*Id.* at 335).

In February 2006, Gerald K. Hoffman, M.D. performed a psychiatric evaluation at the request of the Bureau of Disability Determination Services. (R. at 365). He confirmed the diagnosis of generalized anxiety "complicated by Panic Disorder with Agoraphobia," and opined that the Panic Disorder is the "primary reason for the degree to which her life is currently limited." (*Id.* at 366). Dr. Hoffman also opined that "an inadequately treated anxiety disorder can lead to musculoskeletal aches and pains." (*Id.*).

In addition to medication, Plaintiff received counseling. While she was still working at Honeywell in 2002, she received counseling from the Jane Addams Center. (R. at 61). The records indicate that she attended eight sessions at Jane Addams between December 2001 and August 2002 for treatment of anxiety. (*Id.* at 292). She reported frequent panic attacks (more than once a month) for several years, and described feeling faint to the point of passing out when she is anxious. (*Id.* at 295).

She testified that she again attended counseling again between July 2007 and May 2008,[8] at the FHN Family Counseling Center, formerly known as the Jane Addams Center. (R. at 406–07). She was seen twice a month by Leon Freeburg, a mental health social worker. (*Id.* at 390). Freeburg reported that Plaintiff stated she would not leave her home for days at a time because of panic attacks. (*Id.* at 388).

---

[8] At her July 2007 hearing, she testified that she had not been receiving counseling because she had been without insurance. (R. at 36). Because her new coverage from Illinois CHIPS did not cover pre-existing conditions during the first six months of coverage, she was only able to begin counseling in July 2007. (*Id.*).

Freeburg completed a Mental Capacity Assessment in August 2007 indicating Plaintiff was unable to perform even unskilled work on a competitive sustained basis because she is unable to remember work-like procedures, maintain regular attendance, maintain concentration for a minimal two-hour period, complete a normal workday and workweek without interruption from psychological symptoms, or deal with normal work stress, among other things. (*Id.*). A psychiatric evaluation done by Zehra Rowjee, M.D. on August 16, 2007, found Suess fully oriented, and gave her a primary diagnosis of major depression and a secondary diagnosis of panic attacks with agoraphobia. (*Id.* at 394). Dr. Rowjee prescribed Cymbalta and continued her Xanax. (*Id.*) In October 2007, Suess was "taken off of Lexapro because it was not helping her and she was having [intestinal symptoms] as she had with Cymbalta." (*Id.* at 422). By November 2007, she was placed on Prozac, because the Xanax was not "getting her through" the death of her mother. (*Id.* at 418). She testified that she terminated this counseling because of an inability to pay. (*Id.* at 63). In a note dated February 11, 2008, the FHN case manager indicated that no further refills of her prescriptions will be allowed until Plaintiff sees the doctor and "payments made." (*Id.* at 410). Less than one year later, she was seeing Dr. Reilly at the Monroe Clinic Behavioral Health Department for her panic and depressive disorder. (*Id.* at 436).

Suess also presented evidence, in the form of testimony and medical records, that she suffers from fibromyalgia, carpel tunnel syndrome, and headaches. She suffers from arthritis in her back that affects how long she can sit, and regularly re-

quires her to lie down. (R. at 34, 35, 66–67, 70–71). In terms of her physical abilities, her testimony was that she could sit for about 45 minutes with some shifting around, she can walk two blocks and she can stand for 5–10 minutes.[9] (*Id.* at 70). Her back pain means she has to lie down several times a day. (*Id.* at 67). Her sleep is disturbed due to back pain which leaves her fatigued during the day. (*Id.* at 73–74). Her hands swell which leaves her with a lack of grip strength and shakiness, especially in the morning. (*Id.*). She guessed she could lift ten pounds.[10] (*Id.* at 71).

Her treating rheumatologist, Dr. Dansdill, diagnosed her fibromyalgia as consistent with tender point findings and symptoms. (R. at 309–12, 317–20). He also diagnosed bilateral carpel tunnel syndrome, recurring headaches, and dizziness. (*Id.* at 283, 302, 309, 317, 321, 326, 332, 443). Furthermore, in the Residual Functional Capacity Questionnaire he completed, Dr. Dansdill opined that Plaintiff can stand/walk less than two hours per day, and sit about four hours in an eight-hour workday, with at-will shifting allowed. (*Id.* at 334). Plaintiff began seeing Michael J. Muise, M.D. at the Monroe Clinic in February 2009 complaining of back pain. (*Id.* at 62–63, 436). The records indicate a diagnosis of myalgia (muscle pain), myositis (inflammation of the muscles) (*id.* at 439), and headaches every other day (*id.* at 443). The results from an x-ray of the thoracic spine were unremarkable. (*Id.* at 449).

---

[9] During the 2007 hearing, Suess's husband corroborated that she suffers panic attacks, has to lie down frequently, has headaches, and suffers from carpel tunnel syndrome. (R. at 49).

[10] According to a Summary of Physical Residual Capacity, completed by Suess, she was able to sit for 1.5 hours and stand for a half hour in a workday. (R. at 264). Her Summary also indicated she was able to lift only ten pounds. (*Id.*) Her testimony at her 2009 hearing is consistent with this. (*Id.* at 70–71).

The Medical Expert, Dr. Ellen Rozenfeld, having reviewed the records but never examining Plaintiff, opined as to Suess's mental capacity only, finding that she would be limited to simple routine tasks with "only occasional contact with the public." (R. at 84). Having offered the opinion that Suess could interact with the public "on occasion," Dr. Rozenfeld admitted on cross-examination that she did not know that "on occasion" translates into interacting with the public one-third of the time. (*Id.* at 87). When pressed whether she believed Suess could interact with the public one-third of the time, Dr. Rozenfeld responded "[i]f that is the correct interpretation [of occasional.]" (*Id.* at 88). Dr. Rozenfeld's opinion was contrary to the opinion of Freeburg (*id.*) and Dr. Dansdill, both of whom treated Suess, completed residual function questionnaires, and found her unable to perform light or low skill work (*id.* at 89). Dr. Rozenfeld disagreed with Freeburg because he completed the residual capacity questionnaire after only a few sessions and, even though her Global Assessment of Functioning ("GAF") of 58 was inconsistent with the work-related limitations she was embracing,[11] Freeburg reported Suess's prognosis was good if she continues treatment. (*Id.*). Similarly, although the ME acknowledged that Dr. Dansdill "did suggest [Plaintiff] was severely limited by panic attacks and agoraphobia," because he is an internist, the ME did not credit his opinion regarding Suess's mental health limitations. Dr. Rozenfeld also noted that Dr. Dansdill agreed

---

[11] The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning." DSM-IV at 32. A GAF score of 51–60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* at 34.

that Suess needs more appropriate treatment for anxiety. (*Id.*). Although the ME's opinion hinges on the potential of Suess's mental health improving, Dr. Rozenfeld was unable to opine on the side-effects of medication because she is not a psychiatrist. (*Id.* at 90).

The VE opined that assuming a person could sit, stand, or walk six to eight hours per day, lift or carry 10 pounds regularly and 20 pounds occasionally, was not required to perform repetitive grasping, and was placed in a simple, routine, low-stress job with no regular general contact with public, the person could work as a machine feeder, hand packer, or housekeeper. (R. at 92–93). On cross-examination, the VE testified that the worker must be on task 50 minutes per hour. (*Id.* at 95). Moreover, if the person was able to walk or stand for less than two hours per day, sit for only up to four hours per day, or be expected to miss more than four days per month, these jobs would be eliminated. (*Id.* at 95–96).

## B. The ALJ's Credibility Finding

Plaintiff contends that the ALJ committed several errors in discounting her credibility regarding the intensity, persistence, and limiting effects of her ailments. (P's Mot. 6–12). The ALJ made the following credibility determination:

> After careful consideration of the evidence, the undersigned finds that [Plaintiff's] medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment. [Plaintiff] *just was not entirely credible.* Her complaints of extensive side effects are not supported anywhere in the medical evidence of record. She has had only intermittent treatment, most of this taking place af-

ter the initial July 2007 decision. The record shows [Plaintiff] was able to handle numerous situations/responsibilities with the deaths of her stepfather and her mother. . . .

The medical evidence as a whole does not indicate limitations greater than those in the [RFC], and the subjective record does not support [Plaintiff's] allegations of complete disability. Although [Plaintiff] received treatment for the allegedly disabling impairments, that treatment has been essentially routine and/or conservative in nature, and the record generally indicates this treatment has been successful in controlling any symptoms. It is noted that physical examinations have provided, at best, only minimal support; x-rays do not reveal significant abnormalities, and the clinical and laboratory findings do not demonstrate the presence of conditions that have resulted in limitations greater than those determined in this decision. Furthermore, [Plaintiff's] use of medications does not suggest the presence of an impairment more limiting than found in this decision. Another reason to discount [Plaintiff's] allegations is that, as mentioned earlier, the record reflects work activity after the alleged onset date. Although that work activity did not constitute disqualifying substantial gainful activity, it does show [Plaintiff's] daily activities have, at least at times, been somewhat greater than [Plaintiff] has generally reported. Additionally, [Plaintiff] testified that she has had anxiety for many years, but was able to work with this condition until they moved her to the customer service division. Finally, [Plaintiff] has not been compliant with treatment recommendations, including aerobic exercise, and she continues to smoke cigarettes.

(R. at 23) (emphasis added). This Court agrees with Suess that the ALJ's credibility finding requires remand.

### 1. *Use of boilerplate language*

The ALJ's analysis contains the boilerplate language, oft criticized by the Seventh Circuit Court of Appeals, that "yields no clue to what weight the trier of fact gave [Plaintiff's] testimony." *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (reviewing similar language and finding that "[i]t is not only boilerplate; it is meaningless boilerplate[; t]he statement by a trier of fact that a witness's testimony is 'not

entirely credible' yields no clue to what weight the trier of fact gave the testimony"). In addition to using boilerplate language, the ALJ failed to assess Plaintiff's credibility *before* determining Plaintiff's RFC. That Plaintiff's statements were "not credible to the extent that they are inconsistent with the above residual functional capacity assessment" (R. at 23), is "backward reasoning," *Dogan v. Astrue*, 751 F. Supp. 2d 1029, 1042 (N.D. Ind. 2010). The ALJ's "post-hoc statement turns the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating the [claimant's] credibility as an initial matter in order to come to a decision on the merits." *See Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787–88 (7th Cir. 2003) ("This is precisely the kind of conclusory determination SSR 96-7p prohibits.")

### 2. *Factors considered by ALJ*

"In determining credibility an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c)(3); Social Security Ruling ("SSR")[12] 96-7p, at *2 (ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must

---

[12] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."); *accord Steele*, 290 F.3d at 941–42 ("According to Social Security Ruling 96-7p, . . . the evaluation must contain 'specific reasons' for a credibility finding; the ALJ may not simply 'recite the factors that are described in the regulations.' Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed."). The ALJ's failure to analyze these factors warrants reversal. *See Villano*, 556 F.3d at 562 (because "the ALJ did not analyze the factors required under SSR 96-7p," "the ALJ failed to build a logical bridge between the evidence and his conclusion that [claimant's] testimony was not credible").

The ALJ discredited Suess's credibility because: (1) "her complaints of extensive side effects are not supported" in the medical evidence; (2) she received only intermittent counseling; (3) she was able to handle numerous situations and responsibilities with the deaths of her stepfather and mother; (4) she worked from home after her onset date, selling items online which "show[ed] the claimant's daily activities have, at least at times, been somewhat greater than the claimant has generally reported;" (5) she worked at Honeywell for 25 years *with* anxiety; (6) she was not compliant with getting exercise and "she continues to smoke;" and (7) her use of medications does not suggest a more limiting impairment. (R. at 23).

### a. Medication side-effects

The ALJ found Suess not credible because "her complaints of extensive side effects are not supported" in the medical evidence. (R. at 23). However, it is not accurate that the records do not support Suess's assertions of difficulty with the side-effects of medications. Instead, the records contain numerous instances where treating physicians modified prescriptions and substituted medications in an effort to find treatment that worked and that Suess could tolerate in light of the side-effects. (*Id.* at 35, 37–38, 42, 320–22, 333, 418–22).[13]

### b. Intermittent counseling, failure to quit smoking, and failure to exercise

The ALJ expressed doubt about Plaintiff's credibility because she saw no doctors between August 2005 and March 2007 (R. at 17), and had gaps in her counseling thereafter (*id.* at 23). An ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p, at *7. Furthermore, the SSA "has expressly endorsed the inability to pay as an explanation

---

[13] Without citing to any medical evidence, the ALJ also comments that Plaintiff's "use of medications" undermines her credibility. (R. at 23). Apparently, the ALJ is referring to her conclusion that Plaintiff's use of Prozac and Xanax evince a "history of conservative prescribed medication therapy." (*Id.* at 21). On the contrary, Prozac (fluoxetine) is prescribed for major depression and panic disorder, and Xanax (alprazolam) is prescribed for anxiety disorders and panic attacks. <www.medicinenet.com> The ALJ provides no medical support for her contention that this is "conservative" therapy, which somehow undermines Plaintiff's allegations of disability. *See Rohan v. Chater*, 98 F.3d 966, 968 (7th Cir.1996) ("As this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

excusing a claimant's failure to seek treatment." *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013) (remanding where ALJ found plaintiff not credible in part based on her failure to get consistent treatment where plaintiff had lost insurance); *see* SSR 96-7p, at *8 ("The individual may be unable to afford treatment and may not have access to free or low-cost medical services.").

The record contains numerous references to Plaintiff's financial hardships. (R. at 35–37, 63, 308, 324–25, 410). The ALJ does not address the evidence of financial hardship in the record, but states "[Suess] claims she has no money to have gotten other treatment [for her anxiety], but she continues to smoke one-half to three-fourths a pack of cigarettes a day."[14] (*Id.* at 18). However, the Seventh Circuit has specifically found that, because of its addictive nature, "it is extremely tenuous to infer from the failure to give up smoking that the claimant is incredible when she testifies that the condition is serious or painful." *Shramek v. Apfel,* 226 F.3d 805, 813 (7th Cir. 2000). Only if quitting smoking would have a significant impact on the claimant's ability to return to work, should an ALJ rely on the failure to quit smoking to determine credibility. *Rousey v. Heckler,* 771 F.2d 1065, 1069–70 (7th Cir. 1985) (improper to deny benefits based on claimants inability to quit smoking where the record did not establish that quitting smoking would enable claimant to return to work). While her doctors recommended she stop smoking to help with her erratic sleep, there is no evidence supporting a finding that quitting smoking would allevi-

---

[14] During the 2007 hearing, the ALJ pressed Plaintiff on this point: ". . . you tell me you can't go to health services. Yet you can afford to buy cigarettes? It's not very consistent to me." (R. at 39).

ate her anxiety, panic attacks, or physical ailments.[15] It was error for the ALJ to discount Suess's testimony about her inability to afford treatment *because* she continues to purchase cigarettes.

The ALJ also doubted Plaintiff's credibility because she failed to exercise. This is factually inaccurate. Plaintiff testified that she did yoga stretching at home and that she walked her dog to the post office and back. (R. at 38, 42–43, 71–72). There is nothing in the record to suggest that more exercise was medically required.

The Commissioner contends that although "[Plaintiff] did not have insurance during the entirety of the period under review, the record demonstrated that she was nevertheless able to obtain free medical care." (D's Mot. 10). The Court, however, must limit its review to the rationale offered by the ALJ. *See SEC v. Chenery Corp.,* 318 U.S. 80, 90–93 (1943); *Spiva v. Astrue,* 628 F.3d 346, 353 (7th Cir. 2010) ("the government's brief and oral argument . . . seem determined to dissolve the *Chenery* doctrine in an acid of harmless error"). And here, the ALJ provided no reasoning for rejecting her credibility because she had access to free medical care but choose not to pursue it. On the contrary, the ALJ acknowledged Plaintiff's statement that she only recently learned about the availability of a free clinic. (R. at 17).

---

[15] The Commissioner argues that Plaintiff's "treating physician explained that her smoking habit was 'clearly aggravating her condition.' " (D's Mot. 13 (citing R. at 319)). The Commissioner has taken this comment completely out of context. Plaintiff's treating physician was commenting about the importance of sleep hygiene and opined that "smoking before bed and drinking caffeinated beverages after noon are clearly aggravating [Plaintiff's] condition which includes the inability to get to sleep and stay asleep and unrefreshing sleep." (R. at 319). The physician merely recommended that Plaintiff avoid nicotine for the "four hours before bed." (*Id.*). His recommendation to cease smoking in the four hours before sleep did not address whether smoking was aggravating Plaintiff's anxiety, panic attacks, or physical ailments.

### c. *Honeywell employment and efforts to work from home*

The ALJ noted that Suess "worked at Honeywell for almost 25 years, but had panic attacks maybe once a week when she was in data entry and more often when they moved her to customer service. The anxiety was there when she worked but had not turned into full panic attacks." (R. at 17). A long employment history is not a proper basis to find a claimant lacks credibility. To the contrary, a lengthy work history supports a claimant's credibility. *Aidinovski v. Apfel,* 27 F. Supp. 2d 1097, 1104 (N.D. Ill. 1998) (criticizing ALJ's failure to consider plaintiff's eleven year work history as "favorable to [plaintiff's] credibility"). Moreover, it is uncontested that the panic attacks were worsening over time, while Suess was working, and decreased in frequency, only when she was at home and relaxed. (R. at 40).

In terms of Plaintiff's other work history, she testified that when she was first laid off from Honeywell, she and her husband attempted to sell items online. (R. at 34). The ALJ found that "[a]lthough that work did not constitute disqualifying substantial gainful activity, does show the claimant's daily activities have, at least at times, been somewhat greater than the claimant has generally reported." (*Id.* at 23). There is little in the record about what tasks Suess performed regarding the on-line sales. Assuming she listed items on-line and did so on her own schedule, there is nothing inconsistent with that and her claim of disability. Similarly, the ALJ provides no explanation for how Plaintiff's ability to handle some responsibilities related to the deaths of her mother and stepfather (*id.*) supports finding Plaintiff not credible. The Seventh Circuit has repeatedly cautioned against placing undue

weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home. *Mendez v. Barnhart,* 439 F.3d 360, 362-63 (7th Cir. 2006) ("The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work.") While it is proper for an ALJ to consider daily activities, the ALJ "must explain perceived inconsistencies between a claimant's activities and the medical evidence." *Jelinek v. Astrue,* 662 F.3d 805, 812 (7th Cir. 2011). The limited daily activities testified to by Suess do not support the conclusion that she is capable of fulltime employment as a meat packer, hand packer, or housekeeper. "The critical differences between activities of daily living and activities in a full time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer." *Bjornson v. Astrue,* 671 F.3d 640, 647 (7th Cir. 2012) ("The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.").

Under the circumstances, the ALJ's credibility finding requires remand.

## C. The Weight to be Afforded Plaintiff's Treating Physician

Plaintiff contends that the ALJ failed to give proper weight to the opinion of Dr. Dansdill, Plaintiff's treating physician. (P's Mot. 14–15). Plaintiff asserts that even if the ALJ did not give controlling weight to Dr. Dansdill's opinion, the ALJ was re-

quired to assess the weight in accordance with the regulatory checklist of factors. (*Id.* 15).

By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *accord Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). A treating physician typically has a better opportunity to judge a claimant's limitations than a nontreating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2); other citation omitted).

If a non-treating physician contradicts the treating physician's opinion, it is the ALJ's responsibility to resolve the conflict. *Books*, 91 F.3d at 979 (ALJ must decide which doctor to believe). An ALJ may reject the opinion of a treating physician in

favor of the opinion of a non-treating physician where the non-treating physician has special, pertinent expertise and where the issue is one of interpretation of records or results rather than one of judgment based on observations over a period of time. *Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992) ("[I]t is up to the ALJ to decide which doctor to believe—the treating physician who has experience and knowledge of the case, but may be biased, or . . . the consulting physician, who may bring expertise and knowledge of similar cases—subject only to the requirement that the ALJ's decision be supported by substantial evidence."); *Hofslien v. Astrue*, 439 F.3d 375, 377 (7th Cir. 2006) ("So the weight properly to be given to testimony or other evidence of a treating physician depends on circumstances."). In sum, "whenever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)). It is well-established that "[i]f an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Scott v. Astrue,* 647 F.3d 734, 740 (7th Cir. 2011).

Plaintiff's treating rheumatologist, Dr. David Dansdill, found that Suess could walk three to four blocks without severe pain, could stand less than two hours and sit about four hours in an eight-hour work day. (R. at 334). These physical limitations contradict the ALJ's RFC finding. (*See id*. at 16). Dr. Dansdill further found

that Suess was "severely limited by panic attacks [and] agoraphobia." (*Id.* at 333). He indicated that Plaintiff was incapable of "even 'low stress' jobs" and that her attention and concentration would be interrupted between "frequently and occasionally" during a typical work day. (*Id.*).

The ALJ rejected Dr. Dansdill's opinion because it is, in the ALJ's opinion, "inconsistent and contrast sharply with the other evidence in the record," and "appear[s] to rest . . . on an assessment of impairments outside his area of expertise." (R. at 23). The ALJ critiqued Dr. Dansdill's opinion as (1) failing to contain the "significant clinical and laboratory abnormalities" one should see if Suess is truly disabled; (2) "rel[ying] quite heavily on [Suess's] subjective report of symptoms" despite the ALJ's "good reasons for questioning [Suess's] reliability"; and (3) conflicting with the State Disability Determination Services finding of "not disabled." (*Id.*).

Dr. Dansdill opined that Suess's mental impairments severely limit her ability to work; he also opined that her physical ailments impose specified limitations that would make her unable to perform even light work. Dr. Dansdill's opinions regarding Suess's physical limitations are clearly not outside his area of expertise; he was Suess's treating rheumatologist. (The ALJ incorrectly refers to him as an internist. (R. at 24)). Furthermore, there is no agency finding that contradicts Dr. Dansdill's opinion regarding Suess's physical limitations. Therefore, it appears that the ALJ discounted Dr. Dansdill's opinions regarding Suess's physical limitations because they relied on Suess's reported symptoms and the ALJ found them not supported by clinical and laboratory tests.

The Court has already remanded the ALJ's credibility finding. On remand, the ALJ should also revisit her rejection of Dr. Dansdill's reliance on Suess's subjective reporting consistent with her reconsideration of Suess's credibility. Moreover, almost all diagnoses—especially mental health evaluations—require some consideration of the claimant's subjective symptoms, and here, Plaintiff's statements were necessarily factored into Dr. Dansdill's analysis. *See McClinton v. Astrue*, No. 09 C 4814, 2012 WL 401030, at *11 (N.D. Ill. Feb. 6, 2012) ("Almost all diagnoses require some consideration of the patient's subjective reports, and certainly [the claimant's] reports had to be factored into the calculus that yielded the doctor's opinion."). And there is nothing in the record to suggest that Dr. Dansdill disbelieved Plaintiff's descriptions of her symptoms, or that Dr. Dansdill relied more heavily on Plaintiff's descriptions than his own clinical observations in concluding that Plaintiff was incapable of full-time work. *See Davis v. Astrue*, No. 11 C 0056, 2012 WL 983696, at *19 (N.D. Ill. March 21, 2012) ("The ALJ fails to point to anything that suggests that the weight [the claimant's treating psychiatrist] accorded Plaintiff's reports was out of the ordinary or unnecessary, much less questionable or unreliable."); *Ryan v. Comm'r*, 528 F.3d 1194, 1199–200 (9th Cir. 2008) ("[A]n ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations.").

Furthermore, the physical basis of the disability in this case is fibromyalgia, dizziness, headaches, and back ache. Such conditions are not measured by x-rays and laboratories. *See* 20 C.F.R. § 404.1529(c)(2) (pain will not be rejected solely based on objective findings); *Scott,* 647 F.3d at 736 (reversing denial of benefits where although the "objective medical evidence" showed the plaintiff's "knees were normal and her spine showed only minimal degeneration", "her medical records are replete with instances in which she complained to other doctors about back and knee pain"); *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996) (fibromyalgia is based on subjective, rather than laboratory, findings). The decision to reject Dr. Dansdill's opinions require remand.

## D. ALJ's RFC Finding

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." Y*oung*, 362 F.3d at 1000; *see* 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."); SSR 96-8p, at *2 ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities.").

Plaintiff argues that the ALJ's RFC finding must be remanded because: (1) it lacks support in the record (P's Mot. 4–5); and (2) it ignores several of Suess's symp-

toms, including headaches, fatigue and need to rest, fibromyalgia, panic attacks, and somatoform syndrome (*id.* 12–14).

### 1. Support in the record for the RFC

The ALJ determined that Suess was capable of light work as defined in 20 C.F.R. § 404.1567(b) as a person who is able to sit for 6–8 hours per day, stand or walk 6–8 hours per day, lift or carry 10 pounds regularly and 20 pounds occasionally, and is not required to perform repetitive grasping. (R. at 16). The ALJ further limited Plaintiff's functional capacity by requiring that the work involve a simple, routine, low-stress job with no regular general contact with public. (*Id.*). Suess argues that the ALJ failed to identify any medical evidence in the record supporting this finding. (P's Mot. 5). This Court agrees.

It is uncontested that there is no Physical Functional Capacity Assessment in the record.[16] Furthermore, Dr. Dansdill, Plaintiff's treating rheumatologist, opined that Plaintiff could sit for about four hours per day and stand/walk for less than two hours in an eight-hour work day. (R. at 334). He further stated in his report that Suess can rarely lift 10 pounds, never 20 or 50 pounds, and she has "significant" limitations with reaching, handling, and fingering. (*Id.* at 335). Suess's testimony is consistent with this. (*Id.* at 67–74, 264). Neither the ME, Dr. Rozenfeld, nor Dr. Hoffman, who performed a psychiatric evaluation at the request of the Bureau of

---

[16] There is a Mental Functional Capacity Assessment that does not address Suess's physical abilities. (R. at 382–85).

Disability Determination Services, opined about Suess's physical limitations.[17] Therefore, other than Dr. Dansdill's opinion about Suess's physical capacity and Suess's testimony, there is no medical opinion on which the ALJ could rely to determine Suess's RFC.

A careful review of the ALJ's findings shows a thorough recitation of (1) Plaintiff's testimony, (2) the medical records regarding her physical ailments, and (3) the medical records regarding her mental conditions. (R. at 17–23). This is then followed immediately by the ALJ's rejection of Suess's testimony based on a lack of credibility and the ALJ's rejection of Plaintiff's treating sources' (Dr. Dansdill and Freeburg) opinion evidence.[18] (*Id.* at 23–24). But in rejecting the testimonial and opinion evidence introduced by Plaintiff, the ALJ failed to explain the basis for her determination that Suess was capable of light work. It appears that the ALJ reviewed the medical records and substituted her own evaluation as to Suess's physical capabilities. This requires remand. *See Suide v. Astrue,* 371 F. App'x 684, 689–90 (7th Cir. 2010) (after rejecting physician opinions, ALJ not permitted to fill in the evidentiary deficit with her own lay opinion); *see also* SSR 96-8p, at *5, *7 (ALJ "must consider all allegations of physical and mental limitations or restriction and make every reasonable effort to ensure that the file contains sufficient information to assess RFC." "The RFC assessment must include a narrative discussion describ-

---

[17] Dr. Hoffman did opine that "an inadequately treated anxiety disorder can lead to musculoskeletal aches and pains." (R. at 366).

[18] As noted earlier, the ALJ committed errors in her credibility and treating physician findings requiring remand.

ing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g. daily activities, observations)."); *Scott*, 647 F.3d at 740 ("ALJ did not identify any medical evidence to substantiate her belief that [claimant] is capable of meeting those physical requirements.").

### 2. *Plaintiff's testimony about her symptoms and the ALJ determination*

Plaintiff argues that the ALJ's RFC violated SSR 96-8p by ignoring her symptom-related functional limitations related to her anxiety, panic attacks, depression, fibromyalgia, dizziness, and headaches. (P's Mot. 12–14). Describing Suess's treatment as "routine and/or conservative" and "successful in controlling any symptoms" (R. at 23), the ALJ found that the objective medical evidence, x-rays, and laboratory findings, do not establish the presence of conditions "greater than those" for light work with the limits imposed by the ALJ (*id.*). In fact, the ALJ was clear that she considered Suess's symptoms *only to the* "extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence." (*Id.* at 16).

This is contrary to the case law and requires remand. *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony.") Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which supports claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, *the individual's own statements*

*about symptoms,* statements and other information provided by treating or examin-

ing physicians or psychologists and other persons about the symptoms and how they

affect the individual, and other relevant evidence in the case record." *Arnold v.*

*Barnhart,* 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted) (emphasis added); *see*

20 C.F.R. § 404.1529(c); SSR 96-8p, at *7 ("The RFC assessment must include a dis-

cussion of why reported symptom-related functional limitations and restrictions can

or cannot reasonably be accepted as consistent with the medical and other evi-

dence."); *see also Moss v. Astrue,* 555 F.3d 556, 561 (7th Cir.2009) ("an ALJ cannot

disregard subjective complaints of disabling pain just because a determinable basis

for pain of that intensity does not stand out in the medical record.").

Furthermore, the ALJ's discussion does not address Suess's headaches and fa-

tigue, which require her to lie down daily. *Indoranto,* 374 F.3d at 474 (ALJ failed to

properly evaluate claimant's headaches in hypothetical questions to the VE); *Phil-*

*lips v. Astrue,* 601 F. Supp. 2d 1020, 1034 (N.D. Ill 2009) (ALJ failed to properly as-

sess need to lie down because of headaches); *Dogan,* 751 F. Supp. 2d at 1046 (ALJ

erred in failing to consider need to lie down during the day). Most significantly, the

ALJ's RFC neglected to account for the symptoms related to the Plaintiff's panic at-

tacks and somatoform, the primary bases for the disability request.

This Court cannot sustain the ALJ's finding where there is no indication in the

record that she considered Suess's uncontested panic attacks, headaches, fatigue

and need to rest and somatoform disorder—all of which can be expected to impact

concentration and attendance.

## E. Summary

In sum, the ALJ has failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ shall reevaluate the weight to be afforded Dr. Dansdill's opinions, explicitly addressing the required checklist of factors. The ALJ shall reassess Plaintiff's credibility with due regard for the full range of medical evidence. The ALJ shall then reevaluate Plaintiff's physical and mental impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of her findings in accordance with applicable regulations and rulings.

## V. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [12] is **GRANTED**, and Defendant's Motion for Summary Judgment [19] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: May 10, 2013

_____
MARY M. ROWLAND
United States Magistrate Judge